**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIAM DUVALLY, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-2583 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NEW YORK UNIVERSITY, | |
| Defendant. | |

Plaintiff Liam DuVally ("Plaintiff"), by and through his undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant New York University ("NYU" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and their own personal knowledge.

## I.     NATURE OF THE ACTION

1.      Plaintiff brings this action against NYU for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information including, *inter alia*, current and former students' names, SAT and ACT test scores, GPAs, majors, demographic data, city and zip codes, as well as information related to family members and financial aid dating back to at least 1989. (collectively, "PII"); and for its failure to comply with industry standards to protect information systems that contain PII.[1]

2.      NYU is a private university with its main campus located in New York, New York.

3.      Founded in 1831, NYU "has been an innovator in higher education" and is "one of

---

[1] Dharma Niles, Krish Dev and Yezen Saadah, *Over 3 million applicants' data leaked on NYU's website*, Washington Square News (Mar. 22, 2025), https://nyunews.com/news/2025/03/22/nyu-website-hacked-data-leak/.

the most prominent and respected research universities in the world"[2]

4.      In order to attend NYU, students and applicants are required to directly or indirectly entrust NYU with their PII.

5.      NYU therefore knowingly collects and stores sensitive PII of its current and former students and applicants, and has a resulting duty to secure such information from unauthorized access and exfiltration.

6.      NYU expressly recognizes these duties, representing that NYU "is committed to respecting your privacy."[3]

7.      Despite its duties to safeguard individuals' PII, on March 22, 2025, NYU became aware of a cybersecurity incident where a hacker took over NYU's website for at least two hours which allowed the hacker to expose over 3 million current and former students' and applicants' PII (the "Data Breach" or "Breach").[4]

8.      As a direct and proximate result of NYU's negligent failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII— names, SAT and ACT test scores, GPAs, majors, demographic data, city and zip codes, as well as information related to family members and financial aid—is now in the hands of cybercriminals.

9.      Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[2] *About NYU*, NYU, https://www.nyu.edu/about.html (last visited Mar. 27, 2025).
[3] *Privacy*, NYU, https://www.nyu.edu/footer/privacy.html (last visited Mar. 27, 2025).
[4] *Niles, supra* n. 1.

10.    Plaintiff, on behalf of himself and the Class as defined herein, brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II.    PARTIES

11.    Plaintiff Liam DuVally is an adult and who, at all relevant times, is and was a citizen of the State of New York. Plaintiff is a student at NYU.

12.    Defendant New York University is a private university with its principal campus located at 50 West 4th Street, New York, NY 10012.[5]

## III.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

14.    This Court has general personal jurisdiction over Defendant because NYU is a citizen of the State of New York.

15.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District, a substantial part of the events and omissions giving

---

[5] When subject matter jurisdiction is established under the Class Action Fairness Act, "an LLC's citizenship is based on its principal place of business and laws of incorporation." *Hernandez v. Pure Health Rsch. LLC*, No. 23-cv-00971, 2023 U.S. Dist. LEXIS 191909, at *7 (S.D. Cal. Oct. 25, 2023) (applying § 1332(d)(10) of CAFA) (citing *Jack v. Ring LLC*, 553 F. Supp. 3d 711, 715 (N.D. Cal. 2021)); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (noting that § 1332(d)(10) of CAFA provides a different rule for unincorporated associations).

rise to Plaintiff's claims occurred in this District; and Defendant conducts substantial business within this District.

## IV.    FACTUAL BACKGROUND

**A.    NYU Provides Cloud Based IT Services Involving Highly Sensitive Data.**

16.    NYU is "one of the most prominent and respected research universities in the world, featuring top-ranked academic programs…" It is the "largest private research university in the US, NYU provides a rigorous, demanding education to more than 65,000 students and undertakes $1.27 billion in research annually."[6]

17.    NYU has a diverse student body as its "students come from nearly every state and 133 countries…"[7]

18.    NYU is directly or indirectly entrusted with its current and former students' and applicants' PII. This sensitive PII includes but is not limited to, *inter alia*, names, SAT and ACT test scores, GPAs, majors, demographic data, city and zip codes, as well as information related to family members and financial aid.

19.    When indirect or directly entrusting NYU with their PII, Plaintiff and Class Members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

20.    Plaintiff and Class Members had a reasonable expectation, based in part on NYU's own statements, that their PII would be protected. NYU represents that it "is committed to respecting your privacy."[8] Defendant also has an IT Security Information Breach Notification

---

[6] *About NYU*, *supra* n. 2.
[7] *Id.*
[8] *Privacy*, *supra* n. 3.

Policy that "defines the minimum requirements and responsibilities for reporting security incidents to minimize the negative impact on the confidentiality, integrity, and availability of University Information Resources and University Information and systems."[9]

21.    However, despite Defendant's stated commitment to data security, NYU failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

**B.    The Data Breach.**

22.    On March 22, 2025, NYU became aware of a potential cybersecurity incident involving unauthorized access to certain NYU's Steinhardt School of Culture, Education, and Human Development page.[10]

23.    On March 22, 2025, a hacker was able to exploit existing vulnerabilities in the university's content management system that had reportedly gone unpatched.[11]

24.    The hacker took over NYU's website for at least two hours and exposed over 3 million current and former students' and applicants' PII.[12] Initially reported on Reddit, a user claimed that visitors to NYU's website were met with a list of student names and their academic scores. NYU has stated that the Data Breach includes more information than what was displayed.[13]

25.    According to a cybersecurity expert, the hacker did not redact the posted information correctly exposing full names, addresses, phone numbers, grade point averages, email

---

[9] *IT Security Information Breach Notification Policy and Plan*, NYU (last revised Jan. 31, 2024), https://www.nyu.edu/about/policies-guidelines-compliance/policies-and-guidelines/it-security-info-breach-notification.html.

[10] Silviu Stahie, *Hacker Breaks into NYU Website, Publishes Data on SAT, ACT and GPA Scores, Bitdefender* (Mar. 24, 2025), https://www.bitdefender.com/en-us/blog/hotforsecurity/hacker-breaks-into-nyu-website-publishes-data-on-sat-act-and-gpa-scores.

[11] *Id.*

[12] *Niles, supra* n. 1.

[13] *Stahie, supra* n. 10.

addresses, and more.[14]

26.     Claiming responsibility for the Data Breach on X, the hacker's purported goal was to expose NYU's illegal admission practices stating, "I only posted (redacted) bare minimum to prove they're breaking the law."[15]

27.     The impacted information dates back to at least 1989 and includes over 3 million admitted students' applications, demographic data, city and zip codes, and citizenship status as well as NYU's average admitted SAT scores, ACT scores and GPAs for the 2024-25 admissions cycle. The files also show Common Application data, which includes details of financial aid, rejected students, how many students applied Early Decision and personal information about siblings and parents.[16]

28.     Private assessments of the Data Breach indicate that NYU failed to implement basic steps to safeguard the PII that it was entrusted. According to the hacker's own statements, "the breach didn't require advanced techniques" as he exploited existing unpatched vulnerabilities in the university's content management system.[17]

29.     On March 22, 2025, a NYU spokesperson reported the Data Breach and stated that its IT team was taking steps to make sure the attackers are out of its systems.[18] NYU also began notifying affected students about the Data Breach by an initial email on March 22, 2025 alerting Plaintiff and other students that the hack had occurred and by an update email on March 27, 2025.

30.     Upon information and belief, the Data Breach occurred as a direct and proximate

---

[14] Jonathen Greig, *Hacker defaces NYU website, exposing admissions data on 1 million students*, The Record (Mar. 25, 2025), https://therecord.media/hacker-nyu-website-admissions-race.
[15] *Stahie, supra* n. 10.
[16] *Niles*, *supra* n. 1.
[17] *Stahie, supra* n. 10.
[18] *Niles*, *supra* n. 1.

result of NYU's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect its current and former students' and applicants' PII. Indeed, had NYU properly maintained and monitored its computer systems that stored the PII, Defendant would not have allowed the hacker unimpeded access to access and exfiltrate Plaintiff's and Class Members' PII.

31.    In any event, the scope of the Data Breach shows the severity of NYU's data security failings. The cybercriminal was able to gain access to NYU's computer systems and acquire the access needed to identify the location of databases containing valuable its current and former students' and applicants' PII and exfiltrate that PII. If NYU had even minimal data security measures in place, it would have been able to detect the Data Breach at a point before cybercriminals were able to successfully exfiltrate the data for more than 3 million current and former students and applicants from its computer systems.

**C.    The Value of Private Information and Effects of Unauthorized Disclosure.**

32.    NYU was well aware that the protected PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

33.    NYU also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

34.    These risks are not theoretical, numerous high-profile breaches have occurred such as Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

35.    PII is a valuable commodity to identity thieves. As the Federal Trade Commission

("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[19] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

36.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[20]

37.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[21]

38.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

39.    The ramifications of NYU's failure to keep Plaintiff's and Class Members' PII

---

[19] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Mar. 27, 2025).
[20]    *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.
[21] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Feb. 6, 2024).

secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

40.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[22]

41.    Even if stolen, PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

42.    The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

43.    Importantly, once a cybercriminal has a Fullz package, they can use it to commit a

---

[22] Erika Harrell, *Bureau of Just. Stat.*, U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[23] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[24]

44.     A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[25]

45.     Due to high-profile data breaches, Defendant knew or should have known that its computer systems would be targeted by cybercriminals.

46.     Defendant also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. NYU failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' students' and educators' PII from occurring.

**D.     NYU Failed to Comply with FTC Guidelines and Industry Best Practices.**

47.     NYU is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for

---

[23] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[24] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[25] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

48.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[26]

49.    The FTC recommends that businesses:[27]

   a.    Identify all connections to the computers where sensitive information is stored;

   b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

   c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

   d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

   e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve

---

[26] *Start with Security: A Guide for Business*, U.S. Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf    (last visited Mar. 27, 2025).
[27] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 27, 2025).

information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

50.    The FTC further recommends business take additional cybersecurity steps, which

include:[28]

a.  Conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

b.  Encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.  Crafting a data security plan that involves both physical security (*e.g.*, locking up physical files) and electronic security, and training employees regarding the data security plan.

d.  Promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e.  Developing a plan to handle a data breach or data security incident, if and when such an incident occurs.

51.  The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.  Upon information and belief, NYU failed to properly implement one or more of the basic data security practices described above. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII resulted in the unauthorized

---

[28] *Id.*

access to and exfiltration of Plaintiff's and Class Members' PII.

53.     NYU's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

54.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[29]

55.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[30] Upon information and belief, NYU failed to adhere to the NIST guidance.

56.     Upon information and belief, Defendant's failure to protect Plaintiff's and Class Members' PII is a result of NYU's failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

57.     NYU was, at all times, fully aware of its obligations to protect the PII of its current and former students and applicants. NYU was also aware of the significant repercussions that would result from its failure to do so.

**E.     Plaintiff and Class Members Suffered Damages.**

58.     The ramifications of NYU's failure to keep s current and former students' and applicants' PII secure are long-lasting and severe. Defendant's conduct, which allowed the Data

---

[29] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[30] *Id.* at Table 2 pg. 26-43.

Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

59.    In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[31] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

60.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their

---

[31] Government Accountability Off., *Data Breaches* (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf.

credit reports.[32]

61.     Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

62.     It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

63.     For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

64.     The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[34]

65.     The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

66.     Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise

---

[32] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited Mar. 27, 2025).
[33] *See* 2007 GAO Report, at 29.
[34] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its current and former students' and applicants' PII.

67. As a result of NYU's failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

68. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**F.      Plaintiff's Experience.**

69. Plaintiff is a student at NYU. In order to enroll, Plaintiff was required to entrust NYU with his PII. In collecting and maintaining the PII of Plaintiff, Defendant undertook a duty to act reasonably in its handling of his PII. NYU, however, did not take reasonable care of his PII, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

70. In March 2025, Plaintiff became aware that his PII that was directly or indirectly entrusted to NYU was compromised in the Data Breach.

71. Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

72.    Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

73.    In addition, knowing that hackers accessed and likely exfiltrated his PII and that this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V.    CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the NYU Data Breach which occurred on or about March 22, 2025 (the "Class").

75.    Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

76.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

77.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court.

The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises millions of individuals.[35]

78.    **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendant had a duty to protect the PII of Plaintiff and Class Members;

- Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII;

- Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

- Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

- Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

- Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;

- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

---

[35] *Niles, supra* n. 1.

- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

79.    **Typicality.** Plaintiff' claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently accessed by an unauthorized third party.

80.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

81.    **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

82.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business

practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

83.    **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

84.    Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

85.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

86.    Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

87.     NYU's duty to use reasonable care arose from several sources, including but not limited to those described below.

88.     Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, NYU was obligated to act with reasonable care to protect against these foreseeable threats.

89.     Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. NYU's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

90.     Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

91.     Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. NYU breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of its current and former students' and applicants' information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to

detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

92.     But for NYU's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been access, exfiltrated, and compromised by cybercriminals.

93.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a.     Theft of their PII;

b.     Costs associated with requesting credit freezes;

c.     Costs associated with the detection and prevention of identity theft;

d.     Costs associated with purchasing credit monitoring and identity theft protection services;

e.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h.     Damages to and diminution in value of their PII entrusted to NYU with the mutual understanding that Defendant would safeguard Plaintiff' and Class

Members' data against theft and not allow access and misuse of their data by others; and

i.   Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

94.    As a direct and proximate result of NYU's negligence, including its gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

95.    Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

96.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as NYU for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duties.

97.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' PII and not complying with the industry standards. NYU's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

98.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

99.     Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

100.     NYU's violation of Section 5 of the FTC Act constitutes negligence *per se*.

101.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 93 above.

102.     As a direct and proximate result of NYU's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

103.     Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

104.     Plaintiff and Class Members conferred a monetary benefit on NYU by providing them with their valuable PII.

105.     NYU knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

106.     Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

107.     NYU acquired the PII through inequitable record retention as it failed to disclose

the inadequate data security practices previously alleged.

108.    If Plaintiff and Class Members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendant.

109.    Under the circumstances, it would be unjust for NYU to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

110.    Plaintiff and Class Members are without an adequate remedy at law.

111.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 93 above.

112.    Plaintiff and Class Members are entitled to restitution and/or damages from NYU and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

<u>**FOURTH CAUSE OF ACTION**</u>
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

113.    Plaintiff restates and realleges the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

114.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

115.    An actual controversy has arisen in the wake of the Data Breach regarding

Plaintiff's and Class Members' PII and whether NYU is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possess Plaintiff's and Class Members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

116.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendant owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

      b.    Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

117.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect current and former students' and applicants' PII in their possession.

118.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at NYU. The risk of another such breach is real, immediate, and substantial. If another breach at NYU occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

119.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be

subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

120.    Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

### VII.    PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    For damages in an amount to be determined by the trier of fact;

D.    For an order of restitution and all other forms of equitable monetary relief;

E.    Declaratory and injunctive relief as described herein;

F.    Awarding Plaintiff' reasonable attorneys' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest on any amounts awarded; and

H.    Awarding such other and further relief as may be just and proper.

### VIII.    JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: March 28, 2025

**LYNCH CARPENTER, LLP**

*/s/ Gary F. Lynch*
Gary F. Lynch (NY 5553854)
gary@lcllp.com
Gerald D. Wells, III*
jerry@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    (412) 322-9243
Facsimile:    (412) 231-0246

*Attorneys for Plaintiff and the Proposed Class*
* *Pro hac vice* forthcoming